UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* MARY BIXLER WOOD, *et al.*,<br><br>　　　　　　　　　Plaintiffs,<br><br>　　– against –<br><br>AVALIGN TECHNOLOGIES, INC., INSTRUMED INTERNATIONAL, INC., INSTRUMED GMBH, NEMCOMED FW, LLC, NGINSTRUMENTS, INC., ADVANTIS MEDICAL, INC., ROUNDTABLE HEALTHCARE PARTNERS, L.P., CAREFUSION CORPORATION, and DE PUY SYNTHES, INC.,<br><br>　　　　　　　　　Defendants. | **OPINION & ORDER**<br><br>14 Civ. 4958 (ER) |

RAMOS, D.J.:

　　Relator Mary Bixler Wood filed this *qui tam* action under seal on July 2, 2014 on behalf of the United States of America; the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Utah, Washington, and Wisconsin; the Commonwealths of Massachusetts and Virginia; and the District of Columbia.  Doc. 19.  Relator brought claims under the False Claims Act (the "FCA") and its state counterparts against Avalign Technologies, Inc. ("Avalign"), Instrumed International, Inc. ("Instrumed") (together, the "Avalign Defendants"), Instrumed GmbH, Nemcomed FW, LLC, NGInstruments, Inc., Advantis Medical, Inc., RoundTable Healthcare Partners, L.P., CareFusion Corporation ("CareFusion"), and DePuy Synthes, Inc., alleging that they illegal marketed medical devices never cleared for use by the U.S. Food and Drug Administration (the "FDA") in violation of the Food,

Drug, and Cosmetic Act (the "FDCA"), and that federal and state healthcare programs then improperly reimbursed procedures using these devices. *Id.*

Before the Court is Relator's motion pursuant to Federal Rule of Civil Procedure 54(d)(2) for an award of attorney's fees and expenses following settlements with CareFusion and the Avalign Defendants (collectively, "Defendants").[1]  Doc. 25.  For the following reasons, the motion is GRANTED in part and DENIED in part.

## I.     BACKGROUND
### A. Statutory Background
#### 1. The FCA

The FCA prohibits any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval," as well as "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C.§ 3729(a)(1)(A)–(B).  The Attorney General is responsible for investigating violations of the FCA and may bring a civil action if it has been violated. *Id.* § 3730(a).  However, the FCA also allows private parties ("relators") to "bring a civil action for a violation of section 3729 for the person and for the United States Government." *Id.* § 3730(b)(1).  This is known as a *qui tam* action.  The Government may, in turn, "elect to intervene and proceed with the action." *Id.* § 3730(b)(2).  If it does, "it shall have the primary responsibility for prosecuting the action," and has the authority to "dismiss the action notwithstanding the objections of the person initiating the action," including to settle the action. *Id.* § 3730(c)(1)–(2)(B).  If the Government declines to intervene, relators "shall have the right to conduct the action." *Id.* § 3730(b)(4)(B).

In cases where the Government intervenes and prevails on one or more of the claims, the relator may "receive at least 15 percent but not more than 25 percent of the

---

[1] Though Instrumed GmbH is a subsidiary of Instrumed, Doc. 19 ¶ 12, it did not participate in the settlement, Doc. 23.

proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action." *Id.* § 3730(d)(1). Relator "shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs," for successful claims. *Id*; *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 705 (2d Cir. 2001) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 434–35 (1983), abrogated on other grounds by *Univ. Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).

    2. The FDCA

When it was first enacted, the FDCA, 21 U.S.C. § 301 *et seq.* required FDA approval for the introduction of new drugs into the market, but largely left the regulation of medical devices to the States. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 315 (2008). However, as devices grew more complex, Congress changed this scheme with the Medical Device Amendments of 1976 (the "MDA"), 21 U.S.C. § 360c *et seq.*, which established various levels of federal oversight for devices depending on the level of level of risk they posed.

Under the MDA, certain medical devices require approval or clearance by the FDA before they can be marketed in the United States. This approval or clearance may take several forms. Generally, to provide "reasonable assurance" that the device is both safe and effective, the device must undergo the premarket approval (the "PMA") process. *Id.* § 360e(d)(2). However, there are two exceptions to this requirement. The first is a provision that "grandfathers" certain devices that were already on the market before 1976. *Id.* § 360e(b)(1)(A). The second, is a provision that allows devices to avoid the PMA process if they are "substantially equivalent" to one of these grandfathered devices. *Id.* § 360e(b)(1)(B). The process of reviewing these "substantially equivalent" devices is known as § 510(k) review because it is governed by section 510(k) of the FDCA. Section 510(k) clearance is required before a relevant device is introduced into interstate commerce for the first time, before making a change or modification to an already cleared

device that "could significantly affect safety or effectiveness," or before making a major change or modification to the intended use of a previously § 510(k)-cleared device. 21 C.F.R. § 807.81(a); 21 U.S.C. § 360(k). Failure to do so results in an adulterated and misbranded product, and marketing such a device is prohibited under federal law. *See, e.g.*, 21 U.S.C. §§ 331(p), 351(f), 352(o).

The FDCA and its implementing regulations impose many other requirements on medical devices marketed in interstate commerce. These include, among others, quality controls in accordance with current good manufacturing practices, *see, e.g.*, 21 C.F.R. § 820; labeling requirements, *see, e.g.*, *id.* § 801; and post-marketing obligations, including medical device reporting requirements, *see, e.g.*, *id.* § 803. Failure to comply with any of these requirements may result in the relevant devices being considered "adulterated," 21 U.S.C. § 351, or "misbranded," *id.* § 352.

None of the major federal healthcare programs, including Medicare, Medicaid, TRICARE, and CHAMPVA, provide for reimbursement for the purchase or use of medical devices that lack required § 510(k) approval or that are otherwise adulterated or misbranded.

### B. The Original Complaint and the CareFusion and Avalign Defendants

Relator, previously the Vice President of Quality and Regulatory Affairs for Avalign from February 2010 until her employment was terminated in July 2013, Doc. 19 ¶ 9, filed the original complaint under seal on July 2, 2014. Doc. 19. In it, she alleged that nine defendants knowingly sold thousands of medical devices that had never been cleared for use by the FDA to providers around the country. *Id*. These providers subsequently billed Medicare and other federal and state healthcare programs for procedures using these illegal devices in violation of program rules. *Id*. The complaint alleged thirty-four counts—three counts alleging violations of the FCA, and thirty-one alleging violations of corresponding state laws—and included numerous theories of noncompliance and liability for all of the defendants. *Id.*

As is relevant to the instant motion, Relator alleged eight overarching theories of liability against the Avalign Defendants. In particular, she alleged that Avalign, a manufacturer of medical devices, had:

(1) Marketed medical devices without § 510(k) clearance, *id.* ¶¶ 81–101;

(2) Failed to implement design controls required by Quality System Regulations (QSR), *id.* ¶¶ 102–111;

(3) Failed to implement purchasing controls required by QSR, *id.* ¶¶ 112–125;

(4) Failed to comply with production phase quality requirements, *id.* ¶¶ 126–157;

(5) Failed to meet labeling requirements, *id.* ¶¶ 158–170;

(6) Failed to follow proper complaint handling procedures, *id.* ¶¶ 171–181;

(7) Failed to file medical device reporting submissions, *id.* ¶¶ 182–190; and

(8) Committed various other QSR violations, *id.* ¶¶ 191–205.

With regards to the § 510(k) allegations, Relator alleged that Instrumed, a subsidiary of Avalign, failed to obtain clearance for certain devices in the following four ways: (1) it lacked a documented basis for legally marketing approximately two-thirds of its nearly 30,000 finished devices and components, *id.* ¶ 86; (2) it falsely claimed that a significant number of devices were covered by § 510(k) clearances that did not, in fact, support those devices, *id.* ¶ 87; (3) it marketed numerous devices requiring § 510(k) clearance based on the false premise that the devices qualified as preamendment, *id.* ¶¶ 88–90; and (4) it marketed multiple devices that had been significantly changed, in design or in intended use, from § 510(k)-cleared or preamendment versions, *id.* ¶¶ 91–95.

Relator's § 510(k) claims against CareFusion, a purchaser of Instrumed products, largely relate to her claims against Instrumed. Specifically, Relator alleged that CareFusion "knew that Instrumed was distributing devices without required § 510(k) clearance or evidence of preamendment status." *Id.* ¶ 209.

The United States partially intervened on August 9, 2019, by which time several states had already intervened. Its intervention was limited to one theory of liability: that Instrumed had sold certain medical devices which it claimed qualified as pre-amendment devices, but which it knew could not qualify as such. Docs. 21, 22 ¶¶ 41–65. The Government declined to intervene with respect to the remainder of Relator's theories of liability, including the remainder of her § 510(k) allegations against the Avalign Defendants.[2]

The Government's involvement resulted in two settlements, both of which were limited to the single claim in which it chose to intervene and were not based on the balance of Relator's other theories of liability against these and other defendants. Prior to its intervention, the Government entered into a settlement agreement with CareFusion for $2,821,539.92. The basis of this settlement was that "CareFusion purchased devices from Instrumed that Instrumed wrongly claimed qualified for the pre-amendment status exception, and then sold those devices to hospitals and other health care providers." Doc. 38, Ex. A ¶ 2(d). Upon entering into its settlement agreement, CareFusion obtained a release from the United States, the individual state intervenors, and the Relator. *Id.* ¶¶ 5–7. It entered into a similar agreement with the states. Then, on the same day that it intervened, the Government entered into a Stipulation and Order of Settlement (the "Settlement Agreement") with the Avalign Defendants for $8,128,440.60, plus annual interest. Doc. 23. The Government awarded Relator a 21% share of these two settlements. Do. 26 at 8.

Relator subsequently amended her complaint, dropping some defendants and claims. Doc. 36. Defendants continue to contest all of the non-settled claims.

---

[2] The complaint is unclear as to whether these theories relate to the same medical devices.

### C. Relator's Application for Fees and Costs

Having succeeded on one of her claims, Relator moved for an award of attorney's fees and costs on November 22, 2019 pursuant to Federal Rule of Civil Procedure 54(d)(2).  Doc. 25.  Relator seeks $2,225,690 in attorney's fees for a total of 3,333.1 hours worked, and $4,188.19 in costs.  The attorney's fees can be further broken down into $1,779,615 in common fees,[3] $420,600 in fees specific to the Avalign Defendants, and $144,525 in fees specific to CareFusion.  Doc. 27, Ex. 3.  Relator also requests an additional $27,840 spent in preparing this motion.  Doc. 47 ¶ 14.

Relator requests that the court grant an hourly billing rate of $800 for partners, $500 for senior associates, $400 for associates, and $100–$150 for paralegals and litigation support staff.  Doc. 26 at 11–14.  Relator has provided a summary of her counsel's qualifications and experience, as well as contemporaneous timesheets of the time for which she is seeking compensation.  Docs. 27–28.  In summary, relator's legal team was headed by Brian M. Feldman, a former Assistant United States Attorney, and retired Magistrate Judge Carol E. Heckman of the law firm Harter Secrest & Emery LLP ("HSE"), as well as by Stephen D. Terman, a former FDA lawyer, and J. Mason Weeda of the law firm Olsson Frank Weeda Terman Matz PC ("OFW").  Mr. Feldman is a partner at HSE, where he chairs the Government and Internal Investigations practice group and regularly handles FCA cases.  Doc. 27 ¶¶ 3–6.  Judge Heckman was also a partner at HSE during her time on this case, and is now a partner at the law firm of Lippes Mathias Wexler Freidman LLP.  *Id.* ¶¶ 7–9.  Mr. Terman and Mr. Weeda are principal partners at OFW with extensive experience in FDA law and regulatory issues.  Doc. 28 ¶¶ 3–11.  Several other attorneys from both firms also participated in the case.  According to Relator, the fees she seeks are in keeping with HSE's national billing rates, Doc. 47 ¶ 3, and with Mr. Terman's customary hourly billing rate, Doc. 48 ¶ 2.  HSE is based in

---

[3] These are fees for which Relator alleges CareFusion and the Avalign Defendants are joint and severally liable.

Rochester, with additional offices in Albany, Buffalo, Corning, and New York City; and OFW is based in Washington, DC.

Mr. Feldman and Mr. Weeda prepared the spreadsheets tabulating time entries for their respective firms. In preparing the fee application, Mr. Feldman purports to have "exclude[d] time that [he] would not typically charge to a paying client," Doc. 27 ¶ 32, as well as "any entries that did not relate to the effort to advance the investigation and litigation against CareFusion or Avalign," *id.* ¶ 33, and "billing entries that related exclusively to efforts to advance the prosecution of claims that were declined by the Government and/or otherwise not settled with either CareFusion or Avalign," *id.* ¶ 35. He avers that "[a]fter other write-offs, and after excluding work involving investigation of other defendants (*i.e.*, neither CareFusion nor Avalign), I identified and excluded an additional amount of more than $119,000 in billing entries that appeared to relate exclusively to declined and/or non-settled claims against CareFusion or Avalign." *Id.* In his sworn affidavit, Mr. Weeda similarly reports having excluded hours that were not related to the effort to prosecute the settled claims against CareFusion or the Avalign Defendants. Doc. 28 ¶¶ 22–25.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 54(d)(2)(A) provides, in relevant part, that "[a] claim for attorney's fees and related nontaxable expenses must be made by motion." Such a motion must be filed within fourteen days after the entry of judgment, must specify the judgment and rule entitling the movant to the award, must state the amount sought or provide a fair estimate, and must disclose, if the court so orders, "the terms of any agreement about fees for the services for which the claim is made." Fed. R. Civ. P. 54(d)(2)(B). "The court must find the facts and state its conclusions of law," with regard to the application. *Id.* 54(d)(2)(C).

Under the FCA, "a successful *qui tam* plaintiff shall receive reasonable attorneys' fees and costs." *United States ex rel. Keshner v. Nursing Personnel Home Care*, 794 F.3d

232, 237 (2d Cir. 2015) (internal quotation marks omitted) (quoting 31 U.S.C. § 3730(d)(1)). "The essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011). To determine what constitutes a "reasonable fee," courts begin by looking to the lodestar, "the product of a reasonable hourly rate and the reasonable number of hours required by the case." *Millea v. Metro-North R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011). This creates a "presumptively reasonable fee." *Arbor Hill Concerned Citizens Neighborhood Assoc. v. Cnty. of Albany*, 522 F.3d 182, 183 (2d Cir. 2008). "A detailed explanation of the lodestar calculation is unnecessary, but . . . the district court should at least provide the number of hours and hourly rate it used to produce the lodestar figure." *Millea*, 658 F.3d at 166–67. "Moreover, a court is not obligated to undertake a line-by-line review of the fee application, but may instead exercise its discretion and use a percentage deduction as a practical means of trimming fat." *Kortright Capital Partners LP v. Investcorp Inv. v. Advisers Ltd.*, 392 F. Supp. 3d 382, 406–407 (S.D.N.Y. 2019) (internal quotation marks and citation omitted). "While there is a strong presumption that [the lodestar] represents a reasonable fee, it may be adjusted upward or downward based on other considerations." *Cowan v. Ernest Codelia, P.C.*, No. 98 Civ. 5548 (JGK) (JF), 2001 WL 30501, at *7 (S.D.N.Y. Jan. 12, 2001) (citing *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999)). However, this is only permissible in "rare circumstances," and "[f]actors that are already subsumed in the lodestar calculation cannot be used to enhance or cut the lodestar amount." *Lilly v. City of New York*, 934 F.3d 222, 231 (2d Cir. 2019) (internal quotation marks and citations omitted).

## III.   DISCUSSION

Relator seeks a total of: $2,225,690 in attorney's fees and $4,188.19 in costs in connection with procuring the settlements against CareFusion and the Avalign Defendants, and an additional $27,840 in fees incurred in preparing Relator's fee application. The attorney's fees can be further broken down into $1,779,615 in common

9

fees, $420,600 in fees specific to the Avalign Defendants, and $144,525 in fees specific to CareFusion.  Doc. 27, Ex. 3.  For the reasons stated below, Relator's request is GRANTED in part and DENIED in part.

### A. Fees and Costs in Connection with the Settlements

Both CareFusion and the Avalign Defendants object to the fees sought by Relator. CareFusion raises objections to:  (1) the hourly rate sought by Relator's counsel; (2) the use of block billing and the overuse of redactions[4]; (3) payment sought for time spent negotiating her share of the settlement proceeds with the United States, as well as for pursuing state law claims and for travel; and (4) the CareFusion-specific fees, insofar as they cannot be readily attributed to CareFusion and are also replete with block billing, vagueness, and redactions.  It argues that the Court should only award fees that pertain to the one claim in which the United States chose to intervene and which gave rise to the two settlements—that is, the § 510(k) claim that the Avalign Defendants had sold certain medical devices as pre-amendment devices when it knew this was not the case, and that CareFusion knowingly purchased these devices—resulting in a fee that is only 12.5% (or, one-eighth) of the fee Relator demands.  It further argues that the Court should utilize counsel's customary hourly rates, resulting in a further 47% reduction; reduce the fee by another 10% to account for block billing; and subtract $7,950 recorded in connection with Relator's negotiation of her share of the settlement proceeds.  In short, it asks the Court to reduce Relator's common fee award to a total of $98,683.06, and its CareFusion-specific fee award to $8,617.30.  The Avalign Defendants similarly request that the fee demand be reduced by 90 percent so as to reflect the limited scope of Relator's success and "to account for the Application's other deficiencies, including its reliance on vague and/or block-billed descriptions of the work performed; requests for fees that plainly

---

[4] Relators, in turn, maintain that these entries have been redacted for privilege.  Doc. 46 at 9.

relate to non-settled claims, non-settling defendants, and non-settled products; and exaggerated hourly rates." Doc. 39 at 2.

The Court will consider each of these arguments in turn.

*1. Reasonable Hourly Rate*

Relator's counsel seeks an hourly rate of $800 for partners, $500 for senior associates, $400 for associates, and $100–$150 for paralegals and litigation support staff. Defendants argue that these rates are unreasonable because of "compelling evidence" that these are much higher than the customary rates charged by the two law firms involved, which are based outside of the Southern District (HSE is based in Rochester, with additional offices in Albany, Buffalo, Corning, and New York City; and OFW is based in Washington, DC). Doc. 37 at 12–14. They also argue that the Court should consider counsel's contingency fee arrangement.[5]  *Id.* at 13. To ignore these factors would, they argue, result in a "windfall." *Id.* (citing *United States v. Am. Univ. of Beirut*, No. 14 Civ. 6899 (JPO), 2017 WL 3588647, at *1 (S.D.N.Y. Aug. 17, 2017).

In the Second Circuit, the so-called "forum rule" establishes a rebuttable presumption that "courts should generally use the hourly rates employed in the district in which the reviewing court sits in calculating a presumptively reasonable fee." *Simmons v. New York City Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (internal quotation marks and citations omitted). However, "a district court may use an out-of-district hourly rate—or some rate in between the out of district rate sought and the rates charged by local attorneys—in calculating the presumptively reasonable fee if it is clear that a reasonable, paying client would have paid those higher rates." *Arbor Hill*, 522 F.3d at 191. In determining a reasonable hourly rate, a district court should consider "all pertinent

---

[5] Although the record is silent as to whether any such contingency fee arrangement exists or what its particulars are, CareFusion posits that "it is common in *qui tam* matters for a relator's counsel to work on a contingency basis . . . . Assuming a contingency fee arrangement in this case of between 33% and 50%, Relator's counsel likely already have received compensation in the range of $900,000 to $1.35 million." Doc. 37 at 13.

factors," including the so-called *Johnson* factors. *Lilly*, 934 F.3d at 230. The *Johnson* factors include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Arbor Hill*, 522 F.3d at 186 n.3 (citing *Johnson v. Ga. Highway Exp., Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974)). District courts should also consider that "a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively . . . [and] that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case." *Id.* at 190.

The Second Circuit has not squarely addressed the application of the forum rule to out-of-district attorneys who seek higher Southern District rates simply because of where the action was filed. However, it is not unusual for courts in this Circuit to award lower hourly rates than the hourly rates prevailing in the district where the district court sits. *See Arbor Hill*, 522 F.3d at 193 n.8 (discussing *Crescent Publ'g Grp. Inc. v. Playboy Enters., Inc.*, 246 F.3d 142, 151 (2d Cir. 2001) and collecting cases); *see also Am. Univ. of Beirut*, 2017 WL 3588647, at *1 ("Courts have previously questioned the wisdom and fairness of utilizing a prevailing rate that differs on average by more than $100.00 per hour depending on which side of the Brooklyn Bridge the court sits." (internal quotation marks and citation omitted)). Based on this logic, CareFusion requests that "the Court . . . apply hourly rates similar to those disclosed by the HSE Firm in its public filings— $420/hour for partners, $250/hour for senior associates, $225/hour for associates, and

$125/hour for paralegals." Doc. 37 at 14. But the *Johnson* factors counsel a different result here. In Reply, Relators' counsel has submitted affirmations establishing that their national billing rates are in keeping with the rates sought for this action. *See* Docs. 47–48. And comparable rates have been awarded in this district for similar cases. *See, e.g.*, *U.S., ex rel. Fox Rx, Inc. v. Omnicare, Inc.*, No. 12 Civ. 275 (DLC), 2015 WL 1726474, at *2 (S.D.N.Y. Apr. 15, 2015) (approving rate of $836/hour for partners, $631.75/hour for eighth-year associate, and $541.50/hour for fourth-year associate in FCA case); *TufAmerica Inc. v. Diamond*, No. 12 Civ. 3529 (AJN), 2016 WL 1029553, at *6 (S.D.N.Y. Mar. 9, 2016) ("Recent cases in this district suggest that the prevailing rate for paralegals is between $100 and $200 per hour). Neither does the presence of a contingency arrangement warrant lower fees. *See e.g.*, *United States ex rel. Bisk v. Westchester Med. Ctr.*, No. 06 Civ. 15296 (LAK) (FM), 2016 WL 8254797, at *4 n.10 (S.D.N.Y. Aug. 5, 2016) (finding that contingency fee arrangement did not impact statutory obligation to pay reasonable attorney's fees). While CareFusion is correct that "it is common in *qui tam* matters for a relator's counsel to work on a contingency basis," Doc. 37 at 13, fees of this nature have been awarded in similar FCA matters, *see, e.g.*, *Fox Rx, Inc.*, 2015 WL 1726474, at *2.

The Court therefore declines to depart from the forum rule, and will compute the lodestar using the hourly rates proposed by Relator.

   2. *Number of Hours Worked*

The remainder of CareFusion's and the Avalign Defendants' objections are essentially objections to the number of hours billed by Relator's counsel. Specifically, they object to being billed for hours spent negotiating Relator's share of the settlement proceeds and for hours spent on travel; and, critically, for hours spent pursuing unsuccessful claims, claims against non-settling defendants, or state law claims. Furthermore, the use of block billing and the overuse of redactions, they argue, makes it

13

nearly impossible to parse out whether certain time entries actually relate to the successful claim and/or to CareFusion or the Avalign Defendants.

  a. *Hours Spent Negotiating Award Share and on Travel*

CareFusion and the Avalign Defendants argue that hours spent on negotiating the settlement award share with the United States should be omitted. They further argue that, if the Court grants Relator's counsel's request for billing rates comparable to those in this district, hours spent traveling to the District should be omitted. A "corollary" to the forum rule "is that expenses and fees related to travel must be excluded from an award of attorney's fees." *United States ex rel. Feldman v. Van Gorp*, No. 03 Civ. 8135 (WHP), 2011 WL 651829, at *3 (S.D.N.Y. Feb. 9, 2011). This is because "the hypothetical reasonable client who wishes to spend the least amount necessary to litigate the matter . . . would have retained local counsel." *Id.* (internal quotation marks omitted) (quoting *Imbeault v. Rick's Cabaret Int'l, Inc.*, 08 Civ. 5458 (GEL), 2009 WL 2482134, at *8 (S.D.N.Y. Aug. 13, 2009). Moreover, "hours spent travelling by out-of-district attorneys are not hours 'reasonably expended' where competent counsel is available within the district." *Id.* at *3 n.2.

Relator's counsel has agreed to both of these requests. First, they have removed $7,950 in fees for time spent negotiating Relator's share of the settlement awards. They have also removed $36,000 for travel to and from New York City.[6] The Court has reviewed the billing records, as well as counsel's explanation for how it arrived at the $36,000 figure, and finds these amounts reasonable.

  b. *Hours Not Clearly Attributable to the Successful Claim*

The CareFusion and Avalign Defendants also argue that Relator's counsel should only be compensated for time spent pursuing the successful claim, and that the time sheets submitted make it nearly impossible to determine whether this is what has

---

[6] Relator has also omitted a time entry "that was not needed to succeed in this litigation and therefore should not be included in this fee award motion," resulting in a further deduction of $640. Doc. 46 at 10.

14

occurred.  Due in part to the inadequacy of these timesheets, CareFusion argues that Relator should only be compensated for one-eighth of the time requested.  It arrives at this figure by noting that the complaint "asserted eight distinct and independent claims against six Avalign-related defendants" and "[j]ust *one* of the eight claims also was asserted against CareFusion," which was also the subject of the settlement agreements.  Doc. 37 at 1.  According to CareFusion, Relator's fee application inappropriately allocates "the vast majority of her fees incurred to date to the *single* claim that was settled."  *Id.* at 2.  Similarly, the Avalign Defendants aver that the application inappropriately seeks 95 percent of total fees incurred in connection with this case, for a claim that "comprised only three of the original Complaint's 400-plus paragraphs and . . . represented only one of dozens of distinct theories of liability."  Doc. 39 at 1.  They urge the Court to reduce the fee demand "by at least 90 percent."  *Id.* at 2.

"[W]here a lawsuit presents 'distinctly different claims for relief that are based on different facts and legal theories' the claims should be parsed out and attorneys' fees granted to a plaintiff only on successful claims."  *Mikes*, 274 F.3d 687, 705 (2d Cir. 2001) (quoting *Hensley*, 461 U.S. at 434–35).  There is an exception however, if "successful and unsuccessful claims were interrelated and required essentially the same proof," such that it is not possible to "separate by any rational means the portion of time occupied in connection with the claims and defendants which did not survive."  *Murphy v. Lynn*, 118 F.3d 938, 952 (internal quotation marks and citation omitted).  In other words, "[i]n determining the number of hours reasonably expended for purposes of calculating the lodestar, the district court should exclude excessive, redundant or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims."  *Quaratino*, 166 F.3d at 425 (citation omitted).

The Court agrees that Relator's time entries are deficient.  In arriving at the number of hours worked, counsel purports to have excluded "hours dedicated to severable unsuccessful claims."  Doc. 46 at 4.  To this end, Relator reports that counsel

15

"subtracted and [did not] include[] any time spent *exclusively* on claims that have not (yet, at least) been successful, such as the claims declined by the Government." Doc. 26 at 15 (emphasis added). This assertion, however, does little to assuage the Court. As the Avalign Defendants point out, this strategy "effectively presume[s] that all fees are recoverable *unless the recorded time entries make clear that recovery is precluded*." Doc. 39 at 18. This is particularly a concern as it relates to time entries that appear to commingle fees for work related to both the successful claim and the claims that are still being litigated. *See, e.g.*, Doc. 37, Ex. A at 21, 24, 32, 41.[7] In general, counsel "should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." *Hensley*, 461 U.S. at 437. Relator maintains that she only seeks fees for the work needed to reach the settlements, even though that work may have "simultaneously advanced other claims." Doc. 46 at 6. However, given the imprecise nature of numerous time entries, as well as some block billing, it is impossible for the Court to determine whether such work did, indeed, advance the settlements. Nor has Relator adequately explained how work done advancing other claims necessarily contributed to the settlements. The same issues exist with regard to state law claims, for which Relator is not entitled to attorney's fees. "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437. Relator has not fully met that burden here.

---

[7] In addition, the Avalign Defendants point to other categories of billing entries that are inappropriate, including: (1) those related to labeling, (2) to brand products sold by defendants other than the Avalign Defendants, (3) to claims that the Avalign Defendants may have violated import requirements, and (4) to state law claims. Relator specifically objects only to the second of these, suggesting that these claims were part-and-parcel of the settled claims. *See* Doc. 46 at 5–6 (claiming that "Avalign settled claims that it illegally sold the non-cleared medical devices in Rider 1 of the settlement agreement, all of which were recalled, and those recalls illustrate that each device was branded with a slew of company names"). However, whether or not the Settlement Agreement included certain brand products, the time-entry, as drafted, makes it impossible to determine whether these were Avalign sales or sales by other defendants. Accordingly, the Court agrees that it is inappropriate to include time spent on these matters in calculating the lodestar.

But the Court disagrees with CareFusion and the Avalign Defendants that the hours worked by Relator's counsel should be reduced by either seven-eighths or ninety percent. As Relator notes, it is highly unlikely that counsel spent equal amounts of time on each theory. Relator has submitted that she should be compensated for 3,333.1 hours of work. Doc. 27, Ex. 1. Of these, CareFusion[8] has identified approximately 1102.2 hours that are not in dispute (including time entries that explicitly relate to the settled claim, as well as entries that purport to relate to CareFusion-specific fees), accounting for approximately $689,350 at counsel's rates. Moreover, as discussed above, Relator has agreed to omit time charged for travel, as well as time spent negotiating her share of the settlement awards with the United States. This accounts for a further 154.9 hours. In total then, there remain 2,076 hours in dispute, accounting for approximately $1,417,380. However, upon review of these disputed time entries, the Court finds that CareFusion has, at times, been over-inclusive, and that at least some of these, particularly those after the United States had determined to intervene in the case, are likely mostly attributable to time spent working towards the settlements. The Court will therefore deduct counsel's hours by half of this amount, or 1,038 hours, which accounts for about $708,690. This is slightly more than a thirty percent reduction in the total number of hours spent on this litigation. The Court finds that this is sufficient to "do rough justice." *Fox*, 563 U.S. at 838.

   c. *Block Billing and Overuse of Redactions*

CareFusion and the Avalign Defendants argue that a further deduction from the fee award is necessary to account for block billing and the overuse of redactions. However, the Court finds that its across-the-board deduction for time entries that did not specifically indicate whether they relate to the successful claim already takes block billing and redactions into account. It therefore declines this request.

---

[8] The Avalign Defendants have not submitted a comparable breakdown of disputed fees.

17

### 3. *Calculating the Lodestar*

Having awarded counsel their rates sought, the Court calculates the lodestar by (1) deducting $44,590 to account for time spent negotiating Relator's share of the settlement award, for travel time, and for time that Relator has voluntarily omitted; and (2) reducing the fees sought by $708,690 to reflect a reduction of approximately 1,038 hours spent procuring the two settlements. This results in a presumptively reasonable lodestar of $1,472,410.[9]

### B. Fees in Connection with this Application

Neither CareFusion nor the Avalign Defendants object to Relator's request for fees incurred in preparing the instant application. However, upon review of the timesheets, which were submitted for the first time on Reply, the Court cannot justify the $27,840 in fees sought. Several of the hours reported were spent by partners engaging in tasks like redacting time entries and researching basic case law. Again, the Court cannot determine precisely how many hours were spent performing these tasks because they were block-billed. Yet tasks such as these may be more appropriately billed at the associate level. The Court has therefore reduced the requested fee by twenty-five percent to account for this, resulting in an award of $20,880 in fees for the instant motion.

---

[9] This represents an approximately one-third reduction of Relator's original request of $2,225,690. The Court will accordingly also reduce Relator's requested costs by one-third, resulting in costs of $2,792.13.

## IV. CONCLUSION

For the foregoing reasons, Relator's motion for attorney's fees and costs is GRANTED in part and DENIED in part. The Court will award Relator a total of 1,493,290 in attorney's fees and $2,792.13 in costs. The Clerk of Court is respectfully directed to terminate the motion, Doc. 25.

It is SO ORDERED.

Dated:   May 20, 2020
         New York, New York

_____
EDGARDO RAMOS, U.S.D.J.